## A00A0216. PERKINS v. THE STATE.
(535 SE2d 802)

RUFFIN, Judge.

Benny Perkins was convicted in a bench trial of possession of marijuana with intent to distribute.[1] He appeals, contending that the evidence was insufficient to show that he knowingly possessed the drugs. Because the evidence was sufficient, we affirm.

In considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to support the verdict, and the defendant is no longer entitled to a presumption of innocence. We do not weigh the evidence or determine the credibility of witnesses, but simply determine whether the evidence was sufficient to enable a rational trier of fact to conclude that the defendant was guilty beyond a reasonable doubt of the offense charged.[2]

On Friday, February 13, 1998, Deputy Vincent Hester of the Cobb County Sheriff's Office received a call from the manager of the Smyrna Airborne Express shipping center, who informed Hester of certain "suspicious" parcels that had been shipped from Texas. Hester went to the Airborne Express office in Smyrna and had his drug dog conduct a free air search of several parcels. The dog indicated that two of the parcels contained narcotics. Both packages were addressed to Vince Summerall at 18 Fredda Lane in Cartersville, Georgia. The sender was identified as "U. T. E. P. Home Study Program" in El Paso, Texas.

After obtaining search warrants, Hester opened the packages in the presence of Officer Kevin Cloninger of the Cartersville Police Department. Each package contained individually wrapped packages of marijuana. Altogether, there were 26 packages totaling more than 37 pounds of marijuana, which Hester testified had a wholesale street value of $37,000.

Cloninger and other officers then developed a plan to make a controlled delivery of the packages to the apartment at 18 Fredda Lane. Because Airborne Express would not let the police use one of their marked delivery vehicles, the police rented a plain green van with no markings to use in the delivery. Agent Mark Bertsch of the Drug Enforcement Administration posed as an Airborne Express delivery man and drove to the residence, arriving at about 2:15 p.m. Because the packages were large, he carried one of them to the door and left the other in the delivery van. He knocked on the door, and Perkins answered. According to Bertsch, Perkins "looked at the top of the box and he asked me . . . what office I worked out of." Bertsch

---

[1] The judge also found Perkins guilty of possession of marijuana, but merged the two counts for sentencing.

[2] *Horne v. State*, 237 Ga. App. 844-845 (1) (517 SE2d 74) (1999).

replied that he worked out of the Cartersville office. Perkins told Bertsch to put the packages on the porch. Bertsch set one package down and went back to the van to get the other one. When he returned, Perkins was inside the apartment. Bertsch called him out and asked him to sign the delivery log. According to Bertsch, Perkins "looked at me again and he looked at the package again and the truck again, and then he told me that the name on the package wasn't him and that the person wouldn't be back until three-thirty, and he asked me to redeliver the packages at three-thirty." Bertsch then left and said that he would come back later. Jeff Shelton, a DEA agent conducting surveillance of the residence, testified that Perkins left about 10-15 minutes later in a white truck.

At about 3:00 p.m., Bertsch returned to the residence, but no one was home. Because the delivery instructions did not in fact require a signature, he left the two packages on the porch next to the front door. About an hour later, Perkins returned. According to Shelton, who was continuing his surveillance, Perkins went inside the front door, came back outside, picked up the packages, and took them inside. Shortly thereafter, Perkins drove to a gas station, where he made a telephone call from a pay phone. He returned to the residence about 15 minutes later and went inside. After a few minutes, he came back outside carrying a red duffle bag and got into his vehicle. The police arrested Perkins as he was starting to back out of his driveway. Upon searching him, they discovered $750 in cash in Perkins' wallet.

The police then searched Perkins' apartment pursuant to a search warrant. Upon entering the apartment, Officer Cloninger found the two packages just inside the front door. The packages had not been opened. Cloninger testified that the two-bedroom apartment was sparsely furnished. One bedroom simply contained two or three boxes of personal belongings, with no bed. In the other bedroom, Cloninger found a .380 caliber pistol and ammunition, a partially smoked marijuana cigarette, rolling papers, and metal pipe screens used in smoking marijuana. In the living room, Cloninger found a black address book, which contained a local telephone number for Airborne Express. This same number was found written on the back of a card found in Perkins' wallet. Cloninger testified that he called this number, and that it was an automated system used to track packages.

Agent Shelton testified that he had been involved in 50-100 controlled deliveries of contraband, and that in 99 percent of the cases the packages were addressed to a fictitious person. Agent Bertsch testified that he had been involved in more than 50 controlled deliveries, and that he had never seen a true name on a package. Deputy Hester testified that he had been involved in more than forty con-

trolled deliveries, and that in no more than three cases had the package been addressed to a real person. He testified that the recipients of such packages often leave the residence immediately after the package is delivered to perform a "heat check" — i.e., "to check and see if they're being observed, if they're being followed, if they're under surveillance." He said that they often "get in the vehicle and leave. They'll just drive around with no particular place to go."

Perkins testified that he was originally from El Paso, Texas, but that he had moved to Georgia in September 1997. He said that he lived for a while with his aunt in Rome, but moved into the Fredda Lane apartment in December 1997. He testified that he worked in construction from September until the end of January, earning between $2,400 and $2,800 a month. His children and their mother lived in El Paso at the time, and he said he sent them about $300 once or twice a month. However, he had not worked in more than two weeks prior to his arrest on February 13, 1998.

Perkins claimed that he met Summerall at an Atlanta nightclub on Sunday, February 8, 1998, and learned that Summerall was also from El Paso. The two met again at Perkins' apartment on Wednesday and decided to become roommates. Perkins admitted that he did not really know anything about Summerall other than that he was "some drunk guy [he] met at a bar." According to Perkins, the two arranged to meet between 1:00 and 2:00 p.m. on Friday so that Summerall could sign the lease. However, Summerall did not show up at that time.

At about 2:15 p.m., Bertsch arrived to deliver the two packages. Perkins testified that he told Bertsch that Summerall was supposed to move in later that day, and that he would not sign for the packages because he did not want to be responsible if anything was broken. Even though he was supposed to meet Summerall to sign the lease, and the leasing office closed soon, Perkins testified that he then decided to drive to Rome, about 15 minutes away, to get a haircut. Perkins stated that he left the house at about 3:00 or 3:15, but Agent Shelton testified that he left about 2:20. Perkins claimed that he was gone for an hour and a half or two hours, and that he did nothing during that period other than drive to and from Rome and "wait[ ] in a line to get my haircut."

Perkins testified that, when he returned and saw the packages sitting on the porch, he took them inside because he "thought [Summerall] had already signed for them." Although Summerall did not have any keys to his apartment, Perkins said that "I thought maybe he was in the neighborhood or something." He said that, as soon as he got into the house, he got paged by a friend. Because he did not have a phone in the apartment, he drove to a nearby store to return the call and left a message on the friend's pager. When he returned to

his apartment, he put some work boots in a duffle bag to take to his cousin. He left the apartment to deliver the boots and was arrested by the police.

Perkins admitted that the partially smoked marijuana cigarette and other paraphernalia found in the house were his, although he denied that he sold marijuana. With respect to the Airborne Express telephone number found in his wallet and in his address book, Perkins claimed that he had applied for a job with Airborne Express in the middle of January, and that "[t]he lady at the desk had told me that I was going to start on one of the Mondays, so she gave me this number and told me to call her and that she would set up everything for me to come in." Perkins did not remember the lady's name, however, and did not explain why he did not in fact start working for Airborne Express. He denied that the number was simply for the automated tracking service, claiming that it was a customer service number.

Perkins testified that he has not seen Summerall since his arrest. He testified that he had "[k]inda, sorta" tried to look for him, but only by going to the club where they allegedly met.

The sole issue in this appeal is whether the evidence was sufficient for the court to find that Perkins had knowledge of the contents of the two packages.[3] Because the evidence of Perkins' knowledge is circumstantial, the relevant question is whether, considering the evidence in its totality, a rational trier of fact could conclude that Perkins' guilt is the only reasonable hypothesis consistent with the evidence.[4] In considering this issue, we note that

> [a] reasonable hypothesis . . . refers only to such reasonable inferences as are ordinarily drawn by ordinary [persons] in the light of their experience in everyday life; it does not mean that the act might by bare possibility have been done by someone else.[5]

Furthermore,

> [w]here the defendant offers an explanation of circumstantial facts or an alternative hypothesis of events, the reasonableness of that explanation is for the factfinder. Because the factfinder has heard the witnesses and observed them

---

[3] See *Luke v. State*, 230 Ga. App. 712, 714 (3) (497 SE2d 376) (1998). Perkins does not challenge the sufficiency of the evidence with respect to the "intent to distribute" element, but simply contends that he had no knowledge of the contents of the packages.

[4] See OCGA § 24-4-6; *Blair v. State*, 216 Ga. App. 545, 546 (1) (455 SE2d 97) (1995) (conviction authorized if "totality of the evidence" connects defendant to possession of the drugs).

[5] (Punctuation omitted.) *Sanford v. State*, 193 Ga. App. 18 (1) (386 SE2d 899) (1989).

testify, it is considered more capable of determining the reasonableness of the hypothesis produced by the evidence or lack thereof than is an appellate court. Thus, this court will not disturb its finding unless the verdict is insupportable as a matter of law. If the totality of the evidence is sufficient to connect [the] defendant to possession of drugs, even though there is evidence to authorize a contrary finding, the conviction will be sustained.[6]

In arguing that the evidence was insufficient, Perkins relies on *Luke v. State*, in which we reversed the defendant's conviction for possession of marijuana.[7] In that case, two UPS packages were addressed to the defendant's father. The defendant, who was leaving his father's house when the packages were delivered, signed for them at the request of the delivery man. The police then arrested the defendant and later arrested his father when he returned to the residence. On appeal, we reversed the son's conviction, holding that there was "simply . . . no evidence" that he knew the packages contained contraband.[8] We noted that "[w]hile the evidence creates the gravest suspicion that defendant may be guilty . . . suspicion alone is not sufficient to support a conviction."[9]

If the only evidence in this case was that the packages were addressed to Summerall at Perkins' address and that Perkins signed for the packages, we might agree that *Luke* is controlling and that the conviction must be reversed. However, the facts in this case are far different from those in *Luke*. For instance, the packages in this case were not addressed to a known occupant of the apartment, but to someone whose existence is evidenced only by Perkins' self-serving testimony. In addition, Perkins was from El Paso, where the packages originated, and had family living there at the time of the arrest. There was expert testimony that Perkins' conduct after the packages were delivered was consistent with that of someone who has just received drugs and wants to conduct a "heat check." The fact that Perkins had marijuana paraphernalia and a gun in his house indicates that he was involved in drug activity.[10] The fact that he had a large amount of cash in his wallet also tends to support such a finding, particularly since he had not worked in over two weeks before his arrest.[11]

---

[6] (Citations and punctuation omitted.) *Blair*, supra.

[7] *Luke*, supra at 714-715 (3).

[8] Id. at 714 (3).

[9] (Punctuation omitted.) Id. at 715 (3).

[10] See *Blaylock v. State*, 242 Ga. App. 195, 197 (529 SE2d 203) (2000) (crack pipe found on defendant showed defendant was involved in drug activity at time of arrest).

[11] See generally *Gremillion v. State*, 233 Ga. App. 393, 396-397 (3) (504 SE2d 265)

The trial court could also have found it very significant that Perkins had Airborne Express' tracking number in his address book and in his wallet, since that suggests that he was expecting a package. Although Perkins claimed that the number had been given to him when he applied for a job, the trial court apparently found this explanation highly implausible under the circumstances. Perkins called no witnesses and presented no evidence to support this explanation, and the court could have considered it highly unlikely that he would have been given an automated tracking service number, or even a general customer service number, to call to find out when to report to work. Moreover, Perkins' explanation suggested that he had been hired and was supposed to start work "one of those Mondays." However, he gave no explanation for why he did not in fact start working for Airborne Express. If the court found Perkins' explanation for why he had the number implausible, it could have concluded that the reason he gave such a false explanation was that the real explanation was incriminating — i.e., that he had the number in order to track the delivery of a package.

In addition, the trial court could have found Perkins' conduct upon delivery of the packages difficult to reconcile with his purported lack of knowledge of their contents. In particular, Perkins' first comment to Agent Bertsch was to ask what office he worked out of. This is a rather odd question to ask when receiving a package, and the trial court could have concluded that it indicated a level of wariness or suspicion as to the bona fides of the delivery man. Such wariness would not be expected if the recipient had no reason to suspect that the package contained contraband. The trial court also could have focused on the fact that, after initially indicating that he would accept the packages, Perkins changed his mind when he was asked to sign for them and then left the apartment for a period of time.

When considered in its totality, the above evidence at the very least creates a "grave suspicion" — far graver than in *Luke* — that Perkins was the intended recipient and was aware of the contents of the packages. It is not necessary, however, to decide whether such evidence alone is sufficient to support Perkins' conviction. Perkins did not simply testify that he had no explanation for why drugs might be addressed to "Vince Summerall" and sent to his apartment. Rather, he testified at great length about his purported relationship with Summerall. If the trial court had grounds to disbelieve this tes-

(1998) (large amounts of cash may be factor showing intent to distribute); *Dent v. State*, 233 Ga. App. 605, 606 (1) (506 SE2d 641) (1998) (large amount of cash found in defendant's wallet and pocket supported conviction for possession with intent to distribute); *Polke v. State*, 203 Ga. App. 306, 310 (3) (417 SE2d 22) (1992) (large amount of cash found in house supported finding of intent to distribute).

timony, then it could find that the only reasonable hypothesis consistent with the evidence was that Perkins was the intended recipient of the packages.

The trial court had ample reason to conclude that Perkins fabricated his account of his relationship with Summerall. In order to believe Perkins' account, the trial court would have had to accept that Perkins asked Summerall to be his roommate, even though he knew nothing about Summerall except that he was "some drunk guy [he] met in a bar." The trial court would also have had to believe that, after making arrangements on Wednesday to move in with Perkins on Friday, Summerall had $37,000 worth of marijuana delivered to his own name at Perkins' residence and then failed to show up or otherwise contact Perkins in any way. Furthermore, although Perkins claimed that he and Summerall made very specific plans to meet on Friday so that Summerall could sign the lease, Perkins suddenly decided to drive to Rome that afternoon to get a haircut. At the time Perkins left, about 2:20 p.m., Summerall was only 20 minutes late for this alleged meeting, and Perkins testified that he was still expecting him to show. Moreover, according to Perkins, Summerall had to sign the lease to get a key, and the leasing office closed soon. Nevertheless, Perkins left around 2:20 p.m. and did not return until around 4:00 p.m., according to Shelton.

In addition to the implausibility of Perkins' account, the trial court could have focused on contradictions in Perkins' testimony. For example, Perkins testified on direct examination that he told Bertsch that Summerall "hasn't moved in yet. He's supposed to move in later today. . . . [Y]ou can come back around three-thirty; he should be here by then." Bertsch, however, testified that Perkins said Summerall "wouldn't be back" until 3:30 p.m. and denied that Perkins said anything about Summerall not having moved in yet. When asked at trial where he came up with the 3:30 time, Perkins initially said, "Three-thirty? That's about the time I left." Upon further questioning, however, Perkins said, "Yeah, about three-thirty. I thought I'd be back from my haircut by then," even though he previously claimed that he did not leave for the haircut until 3:00 or 3:15 p.m. Perkins also testified that, after telling Bertsch to return at 3:30 p.m., he said, "well, I tell you what you can do. Go ahead and take it back to the office and I'll have [Summerall] come down there and get it. He said, okay. I said, what office is it? He said, the Cartersville station. I said, fine." Bertsch, however, denied that Perkins said Summerall would come to pick up the packages and testified that Perkins asked what office he worked out of at the beginning of their conversation, immediately after Bertsch said he had a delivery for him.

In addition to the above contradictions and the general implausibility of Perkins' account, the trial court could have found it highly

unlikely that, if Summerall actually existed, Perkins would have made no real effort to locate him prior to trial. By his own admission, Perkins only "kinda, sorta" tried to find Summerall, and these minimal efforts simply consisted of going to the bar where they allegedly met.

In considering whether circumstantial evidence is sufficient to prove a defendant's guilt beyond a reasonable doubt, the trier of fact is authorized to consider the totality of the evidence.[12] Where the defendant offers an alternative hypothesis or explanation of the evidence, the reasonableness of that hypothesis is for the trier of fact to determine,[13] and a reasonable hypothesis "refers only to such reasonable inferences as are ordinarily drawn by ordinary men in the light of their experience in everyday life."[14] For the reasons discussed above, the trial court was authorized to disbelieve Perkins' testimony regarding his relationship with Summerall. Having done so, the trial court could conclude that the only reason Perkins concocted such an implausible explanation was that the true explanation was incriminating. When the evidence is considered in its totality — i.e., when the circumstantial evidence connecting Perkins with the package is considered together with Perkins' false account about his relationship with Summerall — we believe that it was sufficient to authorize the trial court to conclude that Perkins was in fact the intended recipient of the packages and was aware of their contents. Accordingly, the evidence was sufficient to support Perkins' conviction for possession with intent to distribute.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED JUNE 12, 2000.

*McCrory & Baldwin, Aldous D. McCrory*, for appellant.
*T. Joseph Campbell, District Attorney, Pamela D. Brophy, Assistant District Attorney*, for appellee.

---

[12] See *Blair*, supra.
[13] Id.
[14] *Sanford*, supra.